EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION, Ap-
pellee/Cross–Appellant,

v.

LUTHERAN SOCIAL SERVICES,
Appellant/Cross–Appellee.

Nos. 98–5245 and 98–5401.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 30, 1999.

Decided Aug. 24, 1999.

Jonathan P. Graham argued the cause for appellant/cross-appellee. With him on the briefs was Dan S. Sokolov.

John F. Suhre, Attorney, Equal Employment Opportunity Commission, argued the cause for appellee/cross-appellant. With him on the briefs was Philip B. Sklover, Associate General Counsel.

Before: SILBERMAN, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Dissenting opinion filed by Circuit Judge SILBERMAN.

TATEL, Circuit Judge:

In this proceeding to enforce an administrative subpoena, the Equal Employment Opportunity Commission seeks access to a report prepared by attorneys for appellant Lutheran Social Services summarizing the results of an investigation into alleged violations of Title VII. The EEOC argues that Lutheran waived its claim that the report is protected by the attorney-client and work product privileges by failing to comply with a regulation requiring subpoena recipients to present any objections to the Commission within five days. We conclude that under the particular circumstances of this case, Lutheran's failure to present its objections pursuant to the regulation cannot be viewed as a waiver of its attorney-client and work product privileges. In addition, because Lutheran's lawyers conducted their investigation "in anticipation of litigation," we conclude that the entire report is fully protected by the work product privilege.

I

In July 1996, the board of Lutheran Social Services became aware of two anonymous memoranda accusing its president of creating a hostile work environment for female employees. Responding to these accusations, Lutheran placed the president on administrative leave and hired the law firm of Williams & Connolly to investigate the accusations and advise Lutheran as to its potential liability. Williams & Connolly interviewed sixteen employees, two former employees, and two former board members, advising each interviewee that Lutheran had retained the firm to investigate certain charges and asking each to keep the content of the interview confidential. Based on these interviews, Williams & Connolly prepared a report for Lutheran's board that summarized and categorized the interviews (without revealing who made which statements) and assessed Lutheran's potential Title VII liability. Only one copy of the report was made. Board members were permitted to read the report only in the presence of Lutheran's permanent outside counsel, Matthew Watson, and were required to return the copy

to him. Shortly after receiving the report, the board requested the president's resignation.

Almost ten months later, the EEOC began investigating sex discrimination charges filed by two former Lutheran employees. The Commission's investigator asked Lutheran to produce several documents, including the Williams & Connolly report. Lutheran turned over everything the Commission requested except the law firm's report, claiming it to be protected by the attorney-client privilege. Following an exchange of letters between the investigator and Watson, in which Watson reiterated Lutheran's claim of privilege, the EEOC issued a subpoena demanding production of the report by February 13, 1998. Addressed to Lutheran's Human Resources Director, the subpoena was dated January 30 and sent on that date by certified mail.

On about February 9, Lutheran retained Williams & Connolly to represent it in connection with the subpoena. In a February 13 letter advising the EEOC investigator that Lutheran had retained the firm, a Williams & Connolly associate stated that "the subpoena is improper and our client, therefore, does not intend to comply with it." Letter from Oliver Garcia, Williams & Connolly, to Aaron C. Blight, EEOC (Feb. 13, 1998). The letter concluded: "I would be happy to discuss this matter with you further." *Id.* According to the associate, the investigator later responded by telephone, informing him that he was referring the matter to EEOC trial counsel but promising to contact the associate before taking further action. *See* Garcia Decl. ¶¶ 2, 5. The investigator neither recalls nor denies making such a promise. *See* Blight Decl. ¶ 3.

Shortly thereafter, the EEOC filed this enforcement action in the United States District Court for the District of Columbia. The Commission alleged that Lutheran had waived its attorney-client privilege by failing to comply with EEOC procedures for challenging subpoenas. Codified at 29

C.F.R. § 1601.16(b)(1) (1998), those procedures provide that "[a]ny person served with a subpoena who intends not to comply shall petition the issuing Director ... to seek its revocation or modification. Petitions must be mailed ... within five days ... after service of the subpoena." The EEOC promulgated this regulation pursuant to section 710 of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, Pub. L. No. 92–261, § 7, 86 Stat. 103, 109 (1972) (codified at 42 U.S.C. § 2000e–9 (1994)), which grants the Commission all investigative powers possessed by the National Labor Relations Board under section 11 of the National Labor Relations Act, 29 U.S.C. § 161 (1994). Section 11 of the NLRA in turn provides that a party receiving an NLRB subpoena may within five days file a petition with the Board seeking revocation or modification of the subpoena on the grounds that it either "does not relate to any matter under investigation" or "does not describe with sufficient particularity the evidence whose production is required." 29 U.S.C. § 161(1). On the merits, the EEOC argued that the attorney-client privilege does not protect statements made by employees with interests adverse to their employer. The Commission also argued that the work product privilege, which protects only documents prepared "in anticipation of litigation," FED.R.CIV.P. 26(b)(3), was equally inapplicable because at the time Williams & Connolly prepared the report, the prospect of Title VII litigation was "too speculative."

In defense, Lutheran challenged the legality of the EEOC's section 1601.16(b)(1) procedures, arguing that the statute's use of the word "may" prohibited the Commission from adopting mandatory procedures. In the alternative, Lutheran argued that under the particular circumstances of this case—the Commission knew of Lutheran's objections and those objections were based on the attorney-client and work product privileges—its failure to follow the Commission's regulations should not be consid-

ered a waiver. Responding to the Commission's claim that the report was not privileged, Lutheran said that the report revealed confidential communications between the law firm and Lutheran, that it reflected the attorneys' "mental processes," and that the attorneys had prepared it in anticipation of litigation by Lutheran's president and employees.

Without explanation and without reviewing the report, the district court directed Lutheran to produce the report, but allowed it to "redact any portion ... that constitutes legal advice or conclusions." *EEOC v. Lutheran Soc. Servs.*, No. 98ms133 (D.D.C. June 11, 1998). Both sides appeal.

## II

Lutheran first argues that the section 1601.16(b)(1) procedures violate Title VII. Title VII confers on the EEOC the same subpoena authority the National Labor Relations Act gives to the National Labor Relations Board. *See* 42 U.S.C. § 2000e–9. Section 11 of the NLRA provides in full:

Within five days after the service of a subpena [sic] on any person requiring the production of any evidence in his possession or under his control, such person may petition the Board to revoke, and the Board shall revoke, such subpena [sic] if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpena [sic] does not describe with sufficient particularity the evidence whose production is required.

29 U.S.C. § 161(1). According to Lutheran, by making the subpoena review process mandatory (i.e., requiring that a party objecting to the subpoena *"shall* petition" and that petitions *"must* be mailed ...within five days," *see* 29 C.F.R. § 1601.16(b)(1)), the regulation violates the statute's plain language, which uses optional terms (i.e., "such person *may* petition

the Board to revoke"). Lutheran also points out that unlike section 11 of the NLRA, the regulation covers any objection, not just those based on relevance or particularity. Given that "Congress has directly spoken to the precise question at issue," argues Lutheran, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We need not resolve Lutheran's *Chevron* argument, however, because whatever authority the EEOC has under the statute, we conclude that it has no power to strip federal courts of authority to determine whether the subpoena the agency seeks to enforce is lawful.

At the outset, we note that the EEOC conceded at oral argument that compliance with its section 1601.16(b)(1) procedures is not jurisdictional, and for good reason: "[E]xhaustion is a jurisdictional prerequisite," we have held, "[o]nly when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision." *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.,* 727 F.2d 1204, 1208 (D.C.Cir.1984); *see also id.* at 1209 ("Congress knows how to withdraw jurisdiction expressly when that is its purpose.") (internal quotation and citation omitted). An example of just such a clear and unequivocal statement appears in section 313 of the Federal Power Act:

No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon....

... No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.

16 U.S.C. § 825*l* (1994); *see Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 876 F.2d 109, 112–13 (D.C.Cir.1989) ("[T]he requirements imposed by the [Federal Power Act] are strict and go well beyond judicially-imposed standards requiring the exhaustion of administrative remedies prior to the exercise of federal court jurisdiction.... Neither FERC nor this court has authority to waive these statutory requirements."). In contrast, section 11 of the NLRA provides only that parties "may petition the [Commission] to revoke" a subpoena on the basis of relevance and particularity; nowhere does section 11 even imply, much less expressly state, that courts lack jurisdiction to hear objections not presented to the Commission.

■ Agreeing that section 1601.16(b)(1) does not deprive this court of jurisdiction to consider Lutheran's privilege arguments and arguing that his position "does *not* implicate the court's basic authority," our dissenting colleague (but not the EEOC) nonetheless asserts that section 1601.16(b)(1) prohibits us from considering Lutheran's arguments because the regulation is "mandatory." Dissent at 973, 972. If "mandatory" means prohibiting courts from hearing issues not presented to the agency, however, we fail to understand how a regulation can be "mandatory" without being jurisdictional—or at least the functional equivalent. Indeed, the import of the cases cited by the dissent is that mandatory language prohibits courts from considering arguments precisely when the language *is* jurisdictional. *See Weinberger v. Salfi,* 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (distinguishing between "statutorily specified jurisdictional prerequisite[s]" and "the judicially developed doctrine of exhaustion"); *I.A.M. Nat'l Pension Fund,* 727 F.2d at 1209 ("Congress knows how to withdraw jurisdiction expressly when that is its purpose") (internal quotation and citation omitted); *cf. Glisson v. United States Forest Serv.,* 55 F.3d 1325, 1327 (7th Cir.1995) (holding that the "inflexible command of [the] statute" re-

quired exhaustion without deciding whether the command was jurisdictional). And in the absence of a statute clearly depriving courts of jurisdiction to hear issues not first presented to the agency, we know of no principle of administrative law—*Chevron* or otherwise—that would permit an agency to do so on its own.

Contrary to our dissenting colleague's suggestion, nothing in *Darby v. Cisneros,* 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), supports the novel proposition that an agency may, without clear statutory authority, prevent Article III courts from hearing issues not first presented to the agency. *See* Dissent at 973. In *Darby,* a statute (section 10(c) of the APA) expressly empowered agencies to require exhaustion. Here, in contrast, the APA is inapplicable, and the governing statute (section 11 of the NLRA) delegates no such authority to the EEOC. And *Darby*'s holding—that courts may not impose exhaustion requirements in addition to those contemplated by an agency exercising its statutory authority under section 10(c) of the APA—hardly supports our dissenting colleague's theory that an agency may, without congressional authorization, prevent Article III courts from considering issues not first presented to the agency. As *Darby* itself put it: "Of course, the exhaustion doctrine continues to apply *as a matter of judicial discretion* in cases not governed by the APA," 509 U.S. at 153–54, 113 S.Ct. 2539 (emphasis added)—meaning that courts may exercise their traditional authority to hear issues not presented to the agency if the circumstances surrounding noncompliance with agency procedures are sufficiently compelling. In *McCarthy v. Madigan,* moreover, the Supreme Court said quite clearly: "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d

291 (1992) (citations omitted); *see also id.* ("[E]xhaustion is 'a rule of judicial administration,' . . . and unless Congress directs otherwise, rightfully subject to crafting by judges") (quoting *Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 518, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (White, J., concurring in part)). Indeed, notwithstanding our dissenting colleague's characterization of section 1601.16(b)(1) as "nonjurisdictional but mandatory," he stops short of insisting that there are no situations in which we may excuse non-compliance, recognizing that courts still enjoy authority "to consider certain traditional limited exceptions such as futility or agency bias." Dissent at 972.

Nor is there any basis for the proposition that our authority to excuse non-compliance means that section 1601.16(b)(1) has "no legal bite," that we have "no obligation to respect agency rules," or that "an employer . . . [under] subpoena . . . could simply ignore the agency." Dissent at 972. To the contrary, section 1601.16(b)(1)'s mandatory language creates a strong presumption that issues parties fail to present to the agency will not be heard in court. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) ("Simple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."). Hardly a "distressing . . . misuse of judicial power," Dissent at 973, our holding is simply that no categorical bar prevents us from considering whether the facts surrounding Lutheran's failure to file a section 1601.16(b)(1) petition constitute circumstances sufficiently extraordinary to defeat this presumption, a task to which we now turn.

### III

■ We think the circumstances of this case, when considered in combination, excuse Lutheran's failure to present its attorney-client and work product objections to the Commission. To begin with, instead of stating that a subpoena recipient has five days to object or even pointing the recipient to section 1601.16(b)(1), the subpoena (attached as an appendix to this opinion) says only that it "is issued pursuant [to] (Title VII) 42 U.S.C. § 2000e–9." Had Lutheran's Human Resources Director, the subpoena's addressee, looked up section 2000e–9, it would have referred her to section 161 of Title 29 (section 11 of the National Labor Relations Act). Had she then looked up section 161, she would have learned that Lutheran "may" petition the EEOC if it objects to the subpoena on the basis of either relevance or particularity. Nothing on the face of the subpoena or in the statutes to which it referred would have led her to believe that Lutheran *must* petition the EEOC within five days, particularly given that Lutheran's objection rested not on relevance or particularity, but on the attorney-client and work product privileges. *Cf. Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 108 (D.C.Cir.1986) (exhaustion required, in part, because there was "no evidence . . . of neglect on the part of the agency").

To be sure, had Lutheran's permanent counsel, with whom the EEOC investigator had been dealing, learned of the subpoena within the five-day period (the record is silent on this issue) and had he shepardized section 2000e–9, he would have unearthed 29 C.F.R. § 1601.16(b)(1). But because the subpoena itself did nothing to alert the recipient to the Commission's procedures—indeed, by referring the recipient to section 11 of the NLRA, the subpoena may well have misled her into believing that Lutheran had *no* obligation to file a petition with respect to objections not based on relevance or particularity—Lutheran's failure to file a petition was hardly unreasonable.

Even the EEOC investigator seems to have been unaware of Lutheran's section 1601.16(b)(1) obligation. In response to

Williams & Connolly's February 13 letter claiming the subpoena to be "improper," the EEOC investigator never said, "Sorry, you're too late. 29 C.F.R. § 1601.16(b)(1) requires your client to have filed a petition with the District Director within five days of receiving the subpoena." Instead, according to the Williams & Connolly lawyer's affidavit, the investigator agreed to "keep [the lawyer] posted on the EEOC's decision and to contact [the lawyer] before taking further action." Garcia Decl. ¶ 5. True, the investigator does not remember making such a statement, but neither does he deny it, much less claim that he told the Williams & Connolly lawyer about the section 1601.16(b)(1) procedures. Not until the EEOC filed this enforcement action did it mention section 1601.16(b)(1).

Moreover, this is not a case where a subpoena recipient raises an issue for the first time in court. To the contrary, beginning with the very conversation in which the EEOC investigator first requested the report, Lutheran repeatedly claimed the document to be privileged. *See* Letter from Aaron Blight, EEOC, to Matthew Watson (June 26, 1997). Moreover, the EEOC official with whom the regulation required Lutheran to file its petition, the District Director, was aware of the nature of Lutheran's objections. Signed and issued by that very District Director, the subpoena expressly states that the Commission seeks a copy of the report "referenced in previous correspondence." It was in that "previous correspondence" that Lutheran's permanent counsel detailed his client's view that the report was privileged.

■ For all of these reasons, we think it would be inappropriate to view Lutheran's failure to file a section 1601.16(b)(1) petition as a waiver of its privilege claim. So concluding, moreover, would do little if any damage to the integrity of the Commission's section 1601.16(b)(1) procedures. As the Supreme Court has held, "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence."

*Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972) (citing *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). No such benefit would flow from requiring exhaustion in this case, for the EEOC has no expertise with respect to the attorney-client and work product privileges. Indeed, expertise as to those privileges resides in the federal courts. *See* Fed. R.Evid. 501 (The question of privilege is to be "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."). Therefore, even if Lutheran had filed a section 1601.16(b)(1) petition, we would not defer to the EEOC's disposition of Lutheran's privilege claims. *See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP,* 124 F.3d 1304, 1307 (D.C.Cir.1997) (according no deference to agency's views on issues related to work product privilege). This case is thus quite different from the more typical situation where a subpoena recipient's objections rest on relevance or particularity, the two factors listed in 29 U.S.C. § 161. In such cases, exhaustion is important because the EEOC possesses considerable expertise with respect to relevance and particularity, expertise to which we would comfortably defer. *See id.* (agency's interpretation of relevance of subpoena deserves deference because "[t]he scope of the investigation ... is very much dependent on the agency's interpretation and administration of its authorizing substantive legislation").

Conceding that it lacks relevant expertise in this case, the Commission argues that requiring exhaustion is nevertheless appropriate because it gives the commissioners an opportunity to revoke or modify subpoenas, thus conserving judicial resources. This is a worthy goal, but in this case the Commission's General Counsel, charged by Title VII with conducting litigation on the agency's behalf, *see* 42 U.S.C. § 2000e–4(b) (1994), could have sought Commission clearance before filing

this action. Indeed, if the Commission wishes to *ensure* (regardless of the actions of its General Counsel) that it has an opportunity to review all subpoena enforcement issues before they get to court, it can easily do so by adding to the face of the subpoena, which already contains a "Notice to Person Subpoenaed," something like the following:

If you have any objections to this subpoena, you must include them in a petition filed with the issuing official pursuant to 29 C.F.R. § 1601.16(b)(1). Petitions must be mailed within five days of receiving this subpoena. Failure to follow these regulations may result in loss of any ability to raise such objections in court.

*Cf., e.g.,* Federal Trade Commission, Form 68–B, Subpoena Duces Tecum (Sept.1992) (notifying recipients that they have twenty days to petition Commission Counsel to limit or quash the subpoena).

Our conclusion that Lutheran has not waived its privilege claims is reinforced by two additional considerations. First, the attorney-client and work product privileges play an important role in Title VII's enforcement scheme. As the Supreme Court has repeatedly emphasized, "[c]ooperation and voluntary compliance were selected [by Congress] as the preferred means for achieving th[e] goal [of eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin]." *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *see also Ford Motor Co. v. EEOC,* 458 U.S. 219, 228–29, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). The EEOC has likewise pointed to the importance of voluntary compliance. *See, e.g.,* 29 C.F.R. § 1601.24(a) ("Where the Commission determines that there is reasonable cause to believe that an unlawful employment practice has occurred or is occurring, the Commission shall endeavor to eliminate such practice by informal methods of conference, conciliation and persuasion. [42 U.S.C. § 2000e–5] In con-

ciliating a case in which a determination of reasonable cause has been made, the Commission shall attempt to achieve a just resolution of all violations found and to obtain agreement that the respondent will eliminate the unlawful employment practice and provide appropriate affirmative relief."). Voluntary compliance with the law often depends on sound legal advice; sound legal advice in turn often depends on the attorney-client and work product privileges. *See In re Sealed Case,* 146 F.3d 881, 884 (D.C.Cir.1998). Here, Lutheran did precisely what Congress contemplated: It undertook an investigation to assess its compliance with Title VII. What we said in *In re Sealed Case* applies here as well:

[L]acking resources to pursue every suspected violation of federal law, the government must depend on effective, conscientious private lawyers to help clients comply voluntarily. The government might gain some short term benefit by obtaining documents in this case, but the long-range consequences could be quite damaging. Weakening the ability of lawyers to represent clients at the pre-claim stage of anticipated litigation would inevitably reduce voluntary compliance with the law, produce more litigation, and increase the workload of government law-enforcement agencies.

*Id.* at 887.

Second, rejecting the Commission's waiver claim will not deny it access to any sources of possible evidence of discrimination. The Commission can easily obtain whatever evidence of discrimination appears in the lawyers' witness summaries by interviewing the witnesses itself. The only information that the Commission would be unable to obtain from other sources is Williams & Connolly's legal advice. As we have just said, however, allowing access to such advice is inconsistent with Title VII's enforcement scheme.

In sum, under the combined circumstances of this case, we think it both unfair and unwise to penalize Lutheran for failing

to file a section 1601.16(b)(1) petition. Nothing in the cases cited by the dissent from other circuits requires a different result. *See* Dissent at 974–75. In *Maurice v. NLRB*, for example, the Fourth Circuit did not hold—as the EEOC urges us to hold here—that a subpoena recipient had waived her objections by raising them for the first time in federal court. *See* 691 F.2d 182 (4th Cir.1982). Rather, the court instructed the recipient to return to the agency—relief neither sought by the EEOC in this case nor appropriate in view of the fact that the Commission's brief makes it quite clear that it considers Lutheran's privilege claims meritless. *See id.* at 183; *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1489 (D.C.Cir.1983) ("The desirability of avoiding ... unfairness, the purely legal nature of the issue presented, and the likely futility of further resort to the Commission, all operate to convince us that it would be unwise to adhere to the general rule of exhaustion in this case.").

The dissent also cites *Hedison Mfg. Co. v. NLRB*, where counsel promised an administrative law judge that he would produce the subpoena recipient but then failed to do so at the hearing arranged for that purpose. 643 F.2d 32, 34 (1st Cir.1981). Far from erecting the jurisdictional barrier our dissenting colleague reads into the case, the court held that the company, by playing "a game of hare and hounds" with the agency, *id.* (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)), had failed to show "at least a modicum of candor and good faith" and thus had no excuse for failing to exhaust. *Id.*

In *NLRB v. Frederick Cowan & Co.*, the court likewise found that the company's actions exhibited "an utter abandonment

... of normal agency procedures." 522 F.2d 26, 28 (2d Cir.1975). No abandonment occurred in this case. To the contrary, Lutheran presented its objections to the investigator, and its counsel told us at oral argument that his client would have preferred to present its objections to the Commission rather than endure lengthy and costly litigation in federal court.

Finally, in *EEOC v. Cuzzens, Inc.*, the subpoena recipient ignored administrative remedies and argued for the first time in district court that Title VII did not apply to it. 608 F.2d 1062, 1063 (5th Cir.1979) (per curiam). Although the Fifth Circuit held that the recipient's failure to present the objection to the Commission barred it from raising the objection as a defense to the enforcement action, *id.* at 1064, the court made clear not only that this exhaustion requirement was not absolute—it was inapplicable to "objections based on constitutional grounds," *id.*—but also that nothing in its decision prevented Cuzzens from making the identical objection in district court once the case ripened from an EEOC investigation into an actual dispute on the merits. Not so here. If the EEOC obtains access to the report, Lutheran's attorney-client and work product privileges will be lost forever.*

## IV

■ This brings us to the merits of Lutheran's privilege claim. Without examining the report *in camera* and apparently limiting itself to determining whether the report was protected by the attorney-client privilege, the district court ordered disclosure of the document with legal advice and conclusions redacted. Lutheran argues, as it did in the district court, that the entire report is protected because, in addition to containing legal advice, it sum-

---

* We fail to see the relevance of *Swidler & Berlin v. United States*, 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998). *See* Dissent at 975 n.3. Rejecting a balancing test, *Swidler & Berlin* held that the attorney-client privilege survives the death of the client.

That has nothing to do with the issue in this case, i.e., whether a subpoena recipient's failure to file a section 1601.16(b)(1) petition prevents it from raising its objections in court—objections which in this case happen to rest on the attorney-client privilege.

marizes confidential client-to-lawyer communications. Describing the report as also revealing the questions the lawyers asked, the answers the witnesses gave, and the lawyers' summary and categorization of the information received, Lutheran argues that the entire report is also protected by the work product privilege because it reveals Williams & Connolly's "mental impressions, conclusions, opinions, or legal theories." FED.R.CIV.P. 26(b)(3). The EEOC disagrees, claiming with respect to the attorney-client privilege that statements made by employees with adverse interests to their employer are unprotected, and with respect to the work product privilege that the report was not prepared in anticipation of litigation. Because we find the work product privilege dispositive, we begin with it.

■ To resolve the parties' competing work product claims, we ask " 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.' " *Senate of Puerto Rico v. United States Dep't of Justice*, 823 F.2d 574, 586 n.42 (D.C.Cir.1987) (quoting 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024 (1970)). In *In re Sealed Case*, we held that for a document to meet this standard, "the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." 146 F.3d at 884. Applying that test to the facts of that case, we found that documents prepared by counsel for the Republican National Committee in response to news reports questioning the legality of its relationship with another organization, the National Policy Forum, had been prepared in anticipation of litigation even though the Federal Election Commission had yet to file a formal complaint. We relied on an affidavit from an RNC lawyer that stated, "I was ... aware that the chairman of the FEC had announced that the FEC was investigating cases involving allegations of illegal contributions in U.S. elections.... I was further aware that the [National Policy Forum] had been criticized in the press as an organization used by the RNC to evade federal campaign finance laws, and thus I had a significant concern that litigation over this issue was probable." *Id.* at 886. Another RNC lawyer stated, "[F]rom the time the NPF was formed, I and the RNC were concerned about the substantial likelihood of potential litigation...." *Id.* at 886.

Lutheran faced a virtually identical situation. Like the RNC, it had not been sued at the time it hired outside counsel. Also like the RNC, Lutheran hired counsel because it feared litigation. In her affidavit, a Lutheran board member stated, "To prepare for the possibility of a lawsuit by the president, the Board wanted a careful investigation and legal analysis of the allegations against him...." LePard Decl. ¶ 4. She further "agreed" with Williams & Connolly that the investigation "should also be conducted in anticipation of a suit being brought on grounds of a hostile work environment for women." *Id.* ¶ 5. The Williams & Connolly lawyer to whom the Board first spoke said he advised the Board that "the investigation [into hostile work environment] should also be conducted in preparation for a discrimination suit brought by a disgruntled current or former employee." Graham Decl. ¶ 2. In terms of demonstrating a genuine fear of litigation, we see no significant difference between these affidavits and the affidavits in *In re Sealed Case*.

Offering no evidence to counter Lutheran's affidavits, the EEOC hypothesizes that Lutheran undertook its investigation in the "ordinary course of business," which, the Commission says, includes looking into whether the organization was complying with the relevant laws regarding discrimination in the workplace. *See* EEOC Br. at 27. Even if accurate, the Commission's recharacterization of Lutheran's motivation does nothing to under-

mine Lutheran's contention that it genuinely feared litigation. Indeed, fear of EEOC or employee-initiated litigation may well be the very reason why an employer hires outside counsel to determine whether it is complying with Title VII.

Turning to the objective prong of the work product test, the EEOC argues that Williams & Connolly could not have prepared its report "in anticipation of litigation" because the litigation Lutheran feared was "too remote and speculative." EEOC Br. at 24. But the prospect of litigation in this case was no less speculative than in *In re Sealed Case*. There, we found that news reports hinting at illegal behavior coupled with the RNC's fear of litigation provided sufficient objective support for the lawyers' assertion that they had prepared the documents "in anticipation of litigation." *See* 146 F.3d at 885–86, 888. Here too evidence suggests that litigation lay just over the horizon. Lutheran had documents in which its own employees (perhaps future plaintiffs) directly accused the president of creating a hostile work environment. That those documents were anonymous and the charges nonspecific does nothing to undermine the objective reasonableness of Lutheran's fear of litigation. And just as in *In re Sealed Case*, where the RNC's fear of litigation was

eventually confirmed when the FEC filed suit, Lutheran's fear was confirmed when two of its employees filed EEOC charges based on allegations contained in the anonymous memoranda.

Finally, no compelling need requires disclosure of the Williams & Connolly report. As we have noted, the Commission can obtain all of the factual information it seeks by conducting its own interviews. Although it would certainly be easier for the Commission to see the law firm's report, the work product privilege's very purpose is to prevent a party from "perform[ing] its functions ... on wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (Jackson, J., concurring).

Because the EEOC does not challenge Lutheran's claim that the report reveals its lawyers' mental impressions, we find the entire report protected by the work product privilege. We therefore have no need to consider whether the attorney-client privilege also protects the report. This case is remanded to the district court to dismiss the Commission's enforcement action.

*So ordered.*

# APPENDIX

## UNITED STATES OF AMERICA
### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# SUBPOENA

TO: Patricia Singletary, Human Resources Director NO. WO-98-004

Lutheran Social Services

4406 Georgia Avenue, N.W

Washington, DC 20011

IN THE MATTER OF. Alice Williams and Melva Meade vs. Lutheran Social Services

Charge No. 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 and

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

Having failed to comply with previous request(s) made by or on behalf of the undersigned Commission official, YOU ARE HEREBY REQUIRED AND DIRECTED TO:

[ ] Testify before: [ ] Produce and bring * or [X] Mail * the documents described below to:

[ ] Produce access to the evidence described below for the purpose of examination or copying to:

Aaron C. Blight of the Equal Employment Opportunity Commission

at 1400 L Street, NW, Suite 200, Washington, DC 20005 on February 13, 1998 at 9:00 am o'clock

The evidence required is

Provide a copy of the final investigative report, referenced in previous correspondence, regarding the actions of former President and Chief Executive Officer David Temple.

This subpoena is issued pursuant [X] (Title VII 42 U.S.C. 2000e-9) [ ] (ADEA) 29 U.S.C. 626(a) [ ] (EPA) 29 U.S.C. 209 [ ] (ADA) 42 U.S.C. 12117(a)

ISSUING OFFICIAL (Typed name, title and address) ON BEHALF OF THE COMMISSION

Tulio L. Diaz, Director
Washington Field Office
1400 L Street, NW, Suite 200
Washington, DC 20005

Date

*NOTICE TO PERSON SUBPOENAED - The Commission will not pay witness fees or travel expenses for the delivery of required documents to a Commission office unless the box "Testify before" is also checked on the subpoena.

SILBERMAN, Circuit Judge, dissenting:

The majority extends its magic wand over the parties and waives appellant's obligation to exhaust its administrative remedies. I believe that the court lacks the unbridled discretion it asserts and, in any event, that appellant is not entitled to such favored treatment.

Title VII of the Civil Rights Act, passed 35 years ago, was amended in 1972 to give the EEOC the exact investigative powers previously conferred 52 years ago on the NLRB. Accordingly, 29 U.S.C. § 161(1) applies to subpoenas issued as part of the investigative process by both the NLRB and the EEOC. Although it is set forth in the majority opinion, I quote it again:

> Within five days after the service of a subpena [sic] on any person requiring the production of any evidence in his possession or under his control, such person may petition the Board to revoke, and the Board shall revoke, such subpena [sic] if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpena [sic] does not describe with sufficient particularity the evidence whose production is required.

The NLRB issued a regulation interpreting or implementing that statutory provision in 1947. *See* 12 Fed.Reg. 5657, 5660 (1947). The current version of the regulation provides that "[a]ny person served with a subpoena ..., if he or she does not intend to comply with the subpoena, shall, within 5 days after the date of service of the subpoena, petition [the regional director, or if during the hearing, the administrative law judge] in writing to

revoke the subpoena." 29 C.F.R. § 102.31(b) (1999).

Not surprisingly in 1972, the same year Title VII was amended to give the EEOC the investigatory powers of the NLRB, the EEOC issued a virtually identical regulation, *see* 37 Fed.Reg. 9218 (1972), the current version of which provides that "[a]ny person served with a subpoena who intends not to comply shall petition the issuing Director or petition the General Counsel, if the subpoena is issued by a Commissioner, to seek its revocation or modification. Petitions must be mailed to the Director or General Counsel, as appropriate, within five days ... after service of the subpoena." 29 C.F.R. § 1601.16(b)(1) (1999).

The appellant makes much of the distinction between the statute's "may" and the regulation's "shall," but I think that is a tempest in a teapot. The statute could not have used "shall" because it does not include the qualifying phrase "person ... who intends not to comply"; it speaks to everyone served with a subpoena. Obviously, it would make no sense for Congress to tell someone who is served and has no objection to producing information that he or she *shall* petition to revoke. The most reasonable interpretation of the statute, accordingly, is that it is equivalent to the regulation—that the process is obligatory if one wishes to object to a subpoena. There can be no other reason why Congress imposed a five-day limitation.[1] It certainly would have been senseless for Congress to provide that a party may petition within five days, but that nothing is to stop the party from petitioning *after* the five days. The permissive "may" was used, not to create a five-day period that any party can disregard at will, but merely to make clear—quite sensibly—that objec-

---

1. Lutheran suggests that the five-day limitation means instead that the agency is prohibited from seeking enforcement of the subpoena until the revocation period expires. But setting a time limit within which objections are to be filed by recipients would be a positively bizarre way of limiting the *agency's* power.

The argument also assumes that the agency might actually attempt to enforce the subpoena within the five-day period, which strikes me as ridiculous since subpoena recipients typically are given more than five days within which to produce the requested material (Lutheran was given nearly two weeks).

tions are optional. And if a party who objects to a subpoena must petition the agency to revoke within five days, it follows that the exhaustion requirement is mandatory. The majority would do well to bear in mind that the provision in question is part of the NLRB's (and the EEOC's) investigative powers, and it is certainly understandable that Congress should wish such agencies to be armed against efforts to frustrate and delay their investigation. If an employer against whom such a subpoena is issued could simply ignore the agency or say, "I'll see you in court," the investigative process would be significantly impaired.

If the statute is to be honored, the district court should not entertain, in a subpoena enforcement proceeding, a respondent's objection that should have been raised first before the agency.[2] That is simply another way of saying the exhaustion requirement is mandatory. *See McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("Where Congress specifically mandates, exhaustion is *required.*") (emphasis added). To be sure, the EEOC did not argue that the statute created a *jurisdictional* bar to the district court's consideration of appellant's claim, unquestionably because § 161(1) is not phrased in terms of jurisdiction. *Cf. Weinberger v. Salfi,* 422 U.S. 749, 756, 95 S.Ct. 2457, 45 L.Ed.2d 522 (construing a statutory exhaustion requirement that operates by divesting district courts of jurisdiction except in cases of final agency decisions). And we have said that exhaustion is a jurisdictional prerequisite "[o]nly when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision," *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Indus.,* 727 F.2d 1204, 1208 (D.C.Cir.1984)—a requirement that § 161(1) may well not meet (despite its obvious implication). But al-

though it does not speak to *our* jurisdiction, the statute seems to me to impose a mandatory obligation on targets of subpoenas.

The majority not only conflates a statutory provision limiting our jurisdiction with a statute or regulation governing *parties'* behavior, it also ignores the distinction between a mandatory exhaustion requirement created by statute or regulation, and the judicially-created common law doctrine of exhaustion. *See Weinberger,* 422 U.S. at 765–66, 95 S.Ct. 2457 (distinguishing between "statutorily specified jurisdictional prerequisite[s]" and "the judicially developed doctrine of exhaustion"). The latter is a judge-made rule that admits of various prudential exceptions; the former is not. *See I.A.M. National Pension Fund,* 727 F.2d at 1208; *Glisson v. United States Forest Service,* 55 F.3d 1325, 1327 (7th Cir.1995) ("But to the extent that [exhaustion] is a doctrine of federal common law rather than the inflexible command of a statute, it is to be applied with due regard for its underlying purpose and for considerations that may in particular cases counsel for a waiver."). It is relatively open to us to relax the rigors of exhaustion doctrines we ourselves have created, but a statutory or authorized regulatory command is entitled to more respect—even if not phrased in judicial jurisdictional terms. It may well be (there are really no cases in point) that a non-jurisdictional but mandatory exhaustion requirement allows a court to consider certain traditional limited exceptions such as futility or agency bias. But to call the exhaustion requirement non-jurisdictional—the majority's extensive argument to that effect is really a red herring—is not to allow a court to treat it as if it had no legal bite. The majority seems to be under the impression that it has no obligation to respect agency rules unless we are told by Congress that we lack *jurisdiction* to

2. It is rather misleading to ask as the majority does whether the appellant has "waived" its attorney-client privilege; the question is bet-ter phrased as whether the appellant forfeited its claim by not raising it in a timely fashion before the agency.

do otherwise. In my view, this case does *not* implicate the court's basic authority, still less its jurisdiction, but rather illustrates the more familiar, but nevertheless distressing, misuse of judicial power to override rather than defer to a reasonable agency rule. We are "prohibited," as the majority puts it, from hearing appellant's argument not because we lack power to do so but because we are a court of *law.*

Even if the statute itself were thought ambiguous as applied to this case, the NLRB–EEOC regulations—interpretations of § 161(1) that deserve deference, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—unquestionably make exhaustion obligatory and clearly cover all potential defenses such as attorney-client privilege. The Supreme Court has recognized that agencies may promulgate regulations mandating exhaustion which are to be enforced by courts, *see Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), and surely a reasonable regulatory interpretation or elaboration of a statutory exhaustion requirement qualifies as such. I do not see how the majority justifies ignoring this regulation's obligatory nature. That is equivalent to holding the mandatory exhaustion regulation unenforceable and replacing it with a judge-made, equity-inspired, permissive doctrine. As this court asked once before: "If an agency rule requires, without exception, that a party must take an administrative appeal before petitioning for judicial review, on what basis may a court excuse non-compliance?" *Marine Mammal Conservancy, Inc. v. Department of Agric.,* 134 F.3d 409, 411 (D.C.Cir.1998). My answer is: certainly not the basis made up to fit this case.

The majority sideslips *Darby's* recognition that agencies may impose regulatory exhaustion requirements by limiting *Darby* to situations where the agency's regulatory exhaustion requirements are authorized by statutes that speak in jurisdictional terms.

But *Darby* expressed no such limitation; the *Darby* Court was not even concerned with limiting the power of agencies to create exhaustion requirements; it was concerned with limiting the power of courts to do so. Nor does *Darby* confuse (as does the majority) the concept of mandatory exhaustion requirements imposed on parties with statutory provisions that strip courts of jurisdiction. Thus the Court concluded that § 10(c) of the APA "has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute *or rule* clearly mandates." 509 U.S. at 146, 113 S.Ct. 2539 (emphasis added).

Rather inconsistently the majority insists that it shows no disrespect for the agency's rule. Instead, it is simply correcting the agency's "error." *See* Maj. Op. at 964, quoting *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) ("[C]ourts should not topple over administrative decisions unless the administrative body … has erred."). But the majority never identifies the error it is targeting, and it should be obvious that it simply does not like the rule.

Even assuming the exhaustion requirement were not mandatory, in which case we could freely "balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion," *McCarthy,* 503 U.S. at 146, 112 S.Ct. 1081, I do not think it would be appropriate to excuse Lutheran's default. Since Lutheran has not claimed one of the recognized exceptions to the exhaustion requirement, *see id.* at 146–49, 112 S.Ct. 1081— the majority takes a different tack. It reasons instead that, since the issue of the existence or scope of attorney-client and work product privilege is not one that is committed to agency "expertise," there is no basis for enforcing the exhaustion requirement here. That conclusion rests on the erroneous premise that the *only* real purpose of an exhaustion requirement is

"to allow an administrative agency to perform functions within its special competence." *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). But the leading exhaustion case cited by *Parisi,* quoted by the majority, is *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), and *McKart* spoke of exhaustion as having various purposes, including enabling the agency to create a factual record, to apply its expertise, and to exercise its *discretion. See id.* at 194, 89 S.Ct. 1657 (observing that the exhaustion doctrine's furtherance of executive and administrative autonomy is "particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers" or application of special expertise). More recently in *McCarthy,* the Court again said that "[e]xhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power *or* when the agency proceedings in question allow the agency to apply its special expertise." *McCarthy,* 503 U.S. at 145, 112 S.Ct. 1081 (emphasis added).

When a target of an NLRB or EEOC subpoena formally asserts an attorney-client or work product privilege pursuant to the regulation, we should expect, and EEOC's counsel confirmed at oral argument, that the matter is escalated above the litigation attorney to a more senior official of the agency—perhaps the general counsel himself. And, as we should also expect, that might well lead to a modification (or even abandonment) of the agency's subpoena. It is hard to imagine any agency decisions more laced with discretion than such investigative and prosecutorial determinations. *Cf. Heckler v. Chaney,* 470 U.S. 821, 830–35, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (discussing discretionary nature of agency decisions not to undertake enforcement action). That we would not defer to such a decision, once made, does not detract at all from the importance of permitting the agency to resolve the question in the first instance.

I cannot understand the majority's disposition to dismiss this sort of agency discretion as beneath our notice, let alone respect.

Understandably reluctant to be specific about the precise nature of the sweeping discretionary power it arrogates to itself, the majority does not make reference to doctrines of equity. Yet the judicial posture the majority assumes goes far beyond even the balancing of institutional and individual interests that traditionally accompanies non-mandatory common law exhaustion. Its judgment seems ultimately to rest on little more than its determination that the "combined circumstances of this case" make it "unfair" to hold that Lutheran has forfeited its privilege claim, which I suppose translates into a new doctrine of judicial will, *i.e.,* it pleases us not to support the *EEOC's* exhaustion rule.

But since the provision of Title VII and the EEOC regulation at issue in this case simply followed the NLRA and Labor Board regulation, § 1601.16(b)(1) perforce must be interpreted and applied just as we would treat the NLRB's counterpart regulation (and vice versa). And the Board's exhaustion requirement has long been enforced by the federal courts, without any reference to the majority's broad notions of "equity." *See, e.g., Maurice v. NLRB,* 691 F.2d 182, 183 (4th Cir.1982); *Hedison Mfg. Co. v. NLRB,* 643 F.2d 32, 34 (1st Cir.1981); *NLRB v. Frederick Cowan & Co.,* 522 F.2d 26, 28 (2d Cir.1975). In the only circuit case on point, the counterpart EEOC exhaustion requirement was similarly enforced. *See EEOC v. Cuzzens of Georgia, Inc.,* 608 F.2d 1062, 1063–64 (5th Cir.1979) (per curiam); *see also EEOC v. County of Hennepin,* 623 F.Supp. 29, 31–32 (D.Minn.1985); *EEOC v. Roadway Express, Inc.,* 569 F.Supp. 1526, 1528–29 (N.D.Ind.1983). The majority would distinguish these cases, pointing out that *Cowan* and *Hedison,* for example, involved a level of party misconduct not found here. Yet in all of the cases, courts

refused to entertain objections to subpoenas that had not been presented to the issuing agency; in none of them was there a suggestion that open-ended equitable balancing was appropriate or even permissible. This case then is the first serious challenge to important Labor Board and EEOC regulations that go back several decades. The majority's superficially narrow holding—forgiving Lutheran's failure to exhaust given the "combined circumstances of this case," Maj. Op. at 966 should not obscure the far-reaching consequences of its decision. Every case, after all, has its circumstances, and every chancellor's foot a different length. *See generally* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175 (1989).[3]

Finally, even assuming we had the extraordinarily broad equitable discretion the majority claims, I believe there is no reason for invoking it in this case. Traditional equitable doctrines do not help Lutheran here. The EEOC has not waived its exhaustion argument, nor would tolling be of much use since Lutheran never made its privilege objection in writing at any time[4] (as opposed to objecting after the five days passed), *see Jones v. Runyon*, 91 F.3d 1398, 1400 n. 1 (10th Cir.1996) (distinguishing the requirement of a *timely* EEOC filing from the requirement of an EEOC filing). And although the majority suggests that agency officials misled Lu-

theran into thinking that it was not obligated to comply with the regulation—which I take to be an estoppel notion though the majority does not say so—the majority bases this suggestion on Lutheran's lawyer's assertion that an EEOC investigator told him that Lutheran would be notified before the agency took any action. It does not seem to matter that this conversation took place well *after* the five-day period had elapsed, or that the EEOC investigator does not recall making the statement.

A careful parsing of the majority's opinion reveals that the only real ground upon which my colleagues rely to tilt the equities in favor of appellant is the one they "begin" and end with. *See* Maj. Op. at 964–65.[5] That is, the subpoena stated, that "it is issued pursuant [to] 42 U.S.C. § 2000e–9," but did not explicitly alert appellant's Human Resources Director, to whom the subpoena was sent, that under EEOC's regulation (and for that matter the statutory provision that § 2000e–9 incorporates), appellant had five days to object formally.

But it is well settled that inaccurate or ineffective notice from a government agency is an excuse for non-compliance with an EEOC time limit only when the agency is "required to provide notice of the limitations period." *Bowden v. United States*, 106 F.3d 433, 438 (D.C.Cir.1997). Like the

3. Judge Tatel, dissenting in *In Re Sealed Case,* 124 F.3d 230, 239–40 (D.C.Cir.1997), powerfully argued that a loosey-goosey balancing test as applied to attorney-client privilege issues was inappropriate. The Supreme Court agreed. *See Swidler & Berlin v. United States,* 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998). In that case, the clear rule favored private lawyers, whereas here the loosey-goosey approach adopted by the majority apparently bails out some private lawyers.

4. As the majority indicates, Lutheran did inform the EEOC by letter that it thought the subpoena "improper" and that it did not intend to comply. But as I read the regulation, that letter, in addition to being untimely, was fatally deficient not only because it was not sent to the Director who issued the subpoena,

but more importantly because the regulation requires the complaining party to state specifically the grounds of non-compliance, *see* 29 C.F.R. § 1601.16(b)(2).

5. The majority thinks it also significant that Lutheran *orally* informed an EEOC investigator (not the District Director) of its objections and that the District Director was (the majority *infers*) aware of Lutheran's objections. Apparently my colleagues are willing to excuse a party's non-compliance with agency regulations when the party comes "close enough"— in this case, informal conversations with the wrong person that took place *before* the subpoena ever issued. That is, to say the least, a rule of administrative law of which I am not aware.

regulation at issue in *Bowden,* 29 C.F.R. § 1601.16(b)(1) does not require that the agency provide notice of the limitations period for objections. As we held in *Bowden,* even if we thought it would be "sensible and simple" for the EEOC to list the regulation on the face of the subpoena, "the agency had no duty to do so" and thus Lutheran's failure to comply with the regulations cannot be excused on that ground. *Id.*

As for the supposed unfairness to Lutheran in not receiving notice of a federal regulation, I do not know whether to laugh or cry. Any lawyer experienced in the employment law field, of course, would be familiar with the regulation, but I think we should assume that *any* competent lawyer receiving such a subpoena would spend the ten minutes necessary to determine the applicable law. (The majority is willing to assume that Lutheran's Human Resources Director could locate § 161(1) of the Labor Act from the cross-reference in Title VII, but thinks it requires some great feat of legal ingenuity to locate the applicable regulation.) Even if the Human Resources Director had not sent the subpoena to Lutheran's counsel in time (as the majority observes, the record is silent on this issue), that would be no excuse. In today's world, any person in such a job who did not consult counsel immediately would be guilty of gross negligence. Perhaps the import of the majority's opinion is that the NLRB and the EEOC, if they wish their exhaustion regulations honored, will have to give the recipients the administrative law equivalent of a *Miranda* warning, including a list of counsel who have shown competence in employment law.

The majority's last point is that we should excuse Lutheran's failure to exhaust because voluntary compliance with Title VII is an important value, and because that value depends on safeguarding the attorney-client and work product privilege. That conflates the merits of Lutheran's privilege claim with the need for an exhaustion requirement. The Congress and the EEOC, which administers this investigatory regime, believes that a mandatory exhaustion requirement is a necessary and useful component of it. Though voluntary compliance is an important value, and overzealous agency investigation without regard to claims of privilege could undercut that value, it is for the agency, not for this court, to strike the balance. Why the majority cannot see (thinking *ex ante* rather than *ex post*) that its holding will actually undermine voluntary compliance—by encouraging subpoena recipients to flout agency regulations and to gamble on garnering equitable relief from a court—is beyond me. *See generally* Frank H. Easterbrook, *Foreword: The Court and the Economic System,* 98 HARV. L. REV. 4, 10–12 (1984). In any event, I can accept the majority's policy preference no more than I can subscribe to its assertion of discretionary power. I dissent.