Steven McPEEK, Plaintiff,

v.

John D. ASHCROFT, et al., Defendants.

No. CIV.A.00–201(RCL/JMF).

United States District Court,
District of Columbia.

Aug. 20, 2001.

Debra Susan Katz, Ari Micha Wilkenfeld, Lisa Jean Banks, Bernabei & Katz, Washington, DC, for plaintiff.

Allison C. Giles, Carlotta P. Wells, United States Department of Justice, Washington, DC, for defendants

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This matter is before me on *Plaintiff's Motion to Compel.* On April 16, 2001, I granted *Plaintiff's Motion for Leave to Take Five Additional Depositions* but stayed the taking of those depositions pending resolution of the motion to compel. I further directed the parties to meet and confer regarding the motion to compel in light of my previous decisions regarding the attorney-client privilege. On April 24, 2001, I received the parties' jointly filed Praecipe which identified those discovery matters that are no longer at issue. I also subsequently

received individually filed supplemental briefings which addressed those issues that remain in dispute.

This opinion resolves only the defendants' claims that certain documents are privileged from discovery. I have already resolved the plaintiff's claim that the defendants should search the Department of Justice's "back up" tapes in a separate opinion and I will resolve the remaining discovery issues in a subsequent opinion.

### The Lawsuit

Plaintiff, Steven McPeek, is an employee of the Department of Justice. Defendants are Attorney General John Ashcroft and the Department of Justice ("DOJ"). Plaintiff claims that he was retaliated against by members of the DOJ for having filed a complaint of sexual harassment against Michael Quinlan, ("Quinlan") former Director of the Bureau of Prisons. Plaintiff insists that he was denied a promotion, stripped of certain authority and responsibilities, and subjected to ridicule by other members of the Department.

### The documents at issue

In 1992, then-Attorney General William P. Barr requested that OPR investigate plaintiff's allegations of sexual harassment by Quinlan. The purpose of the Attorney General's request was to determine whether or not "disciplinary or other action was warranted." Declaration of H. Marshall Jarrett, Counsel on Professional Responsibility, Exhibit J to *Defendants' Opposition to Plaintiff's Motion to Compel* at 6 (hereafter "Jarrett Declaration."). As Jarrett's declaration indicates, OPR investigated McPeek's allegations and ultimately made a recommendation to the Attorney General as to what to do about them. Richard Rogers, an attorney with OPR, conducted the investigation, and ultimately, Michael Shaheen, counsel to OPR, prepared a recommendation to the Attorney General as to what action to take.

Documents [1] A, B, C, and D are handwritten notes made by OPR attorney Richard Rogers ("Rogers") after interviewing (1) Brook Hedge, former Director of the Federal Programs Branch of the Civil Division, (2) Quinlan, and (3) a private citizen.[2] Docu-

---

**1.** Attached to this opinion is an appendix which (1) identifies the individuals named in the defendant's privilege log and (2) contains a chart indicating the date, author, recipient, topic of the documents claimed to be privileged and the privilege claimed.

**2.** The name of this person has been provided plaintiff's counsel under a protective order.

ment E is the final memorandum submitted by OPR's counsel, Michael Shaheen, to then-Attorney General Barr regarding OPR's investigation of the plaintiff's allegations. According to Jarrett, "OPR's final report in the Quinlan investigation sets forth OPR's opinion in the form of findings and conclusions (as counsel for Attorney General Barr) to its client (Attorney General Barr) based upon its investigation of the Quinlan matter." Jarrett Declaration at 4. Document F is a draft of Document E.

Document G is a form ("OPR–1") closing OPR's investigation of plaintiff's allegations, signed by Rogers, and indicating how the investigation was resolved. Exhibit H is an undated memo from Rogers to a DOJ employee, Gerrie Washington, requesting that a newspaper article be place in the OPR file.

Defendants claim the deliberative process and law enforcement privileges as to Documents A–F[3] and only the law enforcement privilege as to G and H.

### The Deliberative Process Privilege

■ The deliberative process privilege "covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *Department of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Association*, 532 U.S. 1, 121 S.Ct. 1060, 1062, 149 L.Ed.2d 87 (2001) (citations omitted).

■ The deliberative process privilege is an easy fit for Shaheen's recommendation and its earlier draft. Documents E (and the earlier draft, Document F) were created to advise the Attorney General of a proper course of action. The ultimate recommendation was not the final agency decision but rather a pre-decisional document drafted by an inferior governmental official to recommend a course of action by a superior official, the agency's ultimate head. It was therefore a deliberative process document in its purest form.

Plaintiff nevertheless tries to defeat the claim of deliberative process privilege by differentiating between the creation of a policy on the one hand and agency action on the other and insisting that the privilege applies to the former but not the latter. *Supplemental Filing in Support of Plaintiff's Motion to Compel* ("Supp.") at 7–8. Plaintiff cites no authority for this proposition as no court has ever drawn this distinction. To the contrary, the courts never differentiate between the words "action" and "policy" when discussing the deliberative process privilege and use the words interchangeably. *See e.g., National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)(stating that the purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions). More to the point, when one understands the reason for the court's acknowledgment of the existence of this privilege, the proposed distinction between agency policy and agency action has nothing to recommend it.

The deliberative process privilege, also known as the "executive" or "governmental" privilege, serves many purposes:

> [T]o assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980). "Thus, the privilege protects documents reflecting advisory opinions, recommendations, and deliberations which contribute to the process by which governmental decisions and policies are formulated, as well as other subjective documents that reflect the personal opinions of the writer prior to the agency's adoption of the policy." *Taxation with Rep-*

---

**3.** Note that the defendants also claim the attorney-client privilege as to Document E. I do not resolve that claim because I find Document E to be otherwise privileged.

*resentation Fund v. Internal Revenue Service,* 646 F.2d 666, 677 (D.C.Cir.1981).

Given the purpose of the privilege and the myriad of functions of the modern welfare state, making the application of the privilege turn on a distinction between agency policies and actions would be linguistically impossible. One man's action might be another man's policy. Assuming one could draw that distinction among the thousands of tasks a modern government performs, the results would make no sense. For example, internal agency documents created for the purpose of recommending that the agency promulgate a policy governing the ability of HUD property managers to make payments to certain individuals would be privileged, whereas internal agency documents created for the purpose of recommending that the agency deny a property manager's application to manage federally-funded properties because he made such payments would not be.[4] The advancement of the societal interest in having government agencies benefit from the candid and uninhibited exchange of opinions and recommendations is the same whether the government is adopting a policy or taking an action against a particular individual. Indeed, in this case, the need for such candor is particularly obvious.

The investigation conducted by OPR necessarily dealt with the integrity and credibility of two individuals: McPeek and Quinlan. If OPR was to perform its role properly, it had to provide the Attorney General with a recommendation based on a candid evaluation of what it learned. That candor would be irretrievably lost if the deliberative process privilege did not apply to the recommendation. In addition, any public interest in the integrity of the investigation and subsequent recommendation would be defeated unless that candor was encouraged.

■ Plaintiff is simply wrong in asserting that the deliberative process privilege should yield in this case because of his claim of governmental misconduct. Supp. at 7. It is certainly true that this privilege yields when the lawsuit is directed at the government's subjective motivation in taking a particular action. *In re Subpoena Duces Tecum Served*

on the *Office of the Comptroller of the Currency,* 145 F.3d 1422 (D.C.Cir.1998), *on rehearing,* 156 F.3d 1279 (D.C.Cir.1998). But, plaintiff in this case is not attacking whatever final decision was made by then-Attorney General Barr as the result of Rogers' investigation. Plaintiff is instead attacking the actions of government officials in retaliating against him because they learned of the complaint he made against Quinlan which led to the OPR investigation. His case, therefore, does not question in any way the integrity of the investigation OPR conduct or the intent with which it was conducted. Whether or not that investigation was conducted fairly and without any malicious intent is irrelevant to whether or not plaintiff was a victim of retaliation because of the complaint he made against Quinlan. Plaintiff's case is therefore nothing like the cases in which the deliberative process yielded, for example, to a claim that the process sought to be protected was infected by discrimination and was, therefore, the product of a discriminatory intent. *Compare Torres v. City University,* 1992 WL 380561 * 7 (S.D.N.Y.1992).

### The Law Enforcement Privilege

■ Defendants also claim the deliberative process privilege as to notes Rogers took during his interviews with Hedge, Quinlan, and a certain individual, i.e., Documents A–D. While Judge Urbina has concluded that the handwritten notes of the Attorney General made during a meeting may qualify for protection under the deliberative process privilege,[5] there is no need to consider the issue of deliberative process as to Rogers' notes if these documents are protected by the law enforcement privilege. Moreover, since Rogers is not the head of an agency or recommending a course of action to a superior but was instead charged with the obligation to investigate conduct by Quinlan, the law enforcement privilege is a much better and easier fit.

Judge Lamberth has concluded, in a decision affirmed by the Court of Appeals, the law enforcement privilege pertains to an investigation conducted by OPR into allegations of misconduct which OPR has jurisdic-

---

4. *See generally Eugene Burger Management Corp. v. HUD,* 192 F.R.D. 1 (D.D.C.1999).

5. *Judicial Watch v. United States Department of Justice,* 102 F.Supp.2d 6 (D.D.C.2000).

tion to investigate. *See Tuite v. Henry,* 98 F.3d 1411, 1413 (D.C.Cir.1996)("We affirm as reasonable the District Court's determination that the Government [i.e. OPR] properly raised its claim of privilege.").

As Judge Lamberth thereafter explained on remand:

> The federal law enforcement privilege is a qualified privilege designed to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement. The privilege serves to preserve the integrity of law enforcement techniques and confidential sources, protects witnesses and law enforcement personnel, safeguards the privacy of individuals under investigation, and prevents interference with investigations.

*Tuite v. Henry,* 181 F.R.D. 175, 176 (D.D.C. 1998), *aff'd* 203 F.3d 53 (D.C.Cir.1999).

Indeed, a DOJ regulation guarantees the confidentiality of the information provided OPR during its investigations. Office of Professional Responsibility, 28 C.F.R. § 0.39b (2000). Thus, the application of the law enforcement privilege to OPR investigations cannot be seriously questioned. Nevertheless, plaintiff dismisses its application to this case because the investigation was administrative and not criminal. Supp. at 8. Once again, plaintiff cites no authority which accepts this distinction and then refuses to apply the privilege to administrative investigations. Moreover, the jurisdiction of OPR is broadly stated:

> § 0.39a Functions.
>
> The Counsel [6] on Professional Responsibility shall:
>
> (a) Receive and review any information or allegation concerning conduct by a Department employee that may be in violation of law, regulations or orders, or of applicable standards of conduct or may constitute mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety. However, this provision does not preempt the primary responsibility of internal inspection units of the Department to receive

such information or allegations and to conduct investigations.

28 CFR § 0.39a (2000).

OPR therefore has jurisdiction well beyond criminal matters including matters that I have to suppose plaintiff would dismiss as "administrative." But, there is no reason that the law enforcement privilege should be not be coterminous with OPR's jurisdiction. The law enforcement privilege serves the societal interest in the prompt and fair investigation of improper behavior by protecting sources of information, encouraging them to come forward, and preventing the premature disclosure of information which could harm a person's reputation unfairly and unnecessarily. This interest is the same whatever the nature of the allegation OPR investigates. It is absurd to suggest that there is less societal interest in the investigation of an Assistant United States Attorney's violation of the Code of Ethics than there is in whether a Department of Justice clerk used governmental stamps to mail a personal letter because someone could characterize the former as "administrative" and the latter as "criminal" because converting the stamps to the clerk's own use might constitute the crime of embezzlement. Thus, plaintiff's slippery distinction has nothing to do with the purpose of the privilege and has to be rejected.

### The Tuite v. Henry Factors

■ The defendants' assertion of the law enforcement privilege requires the court to weigh the competing interests and the factors identified by the court of appeals in *Tuite v. Henry,* 98 F.3d at 1411. While the defendants discuss why the weighing of these factors militates against disclosure, plaintiff unfortunately ignores the *Tuite* cases, the factors identified in them, and thus never indicates why the weighing of them compels disclosure. Plaintiff's failure to discuss those factors, found in controlling Circuit authority, could be deemed a waiver of any right to do so and require me to sustain the defendants' claim of privilege. Nevertheless, in the interest of completeness, I will weigh the pertinent factors [7] in determining whether to or-

---

**6.** This Counsel is the head of the Office of Professional Responsibility. 28 C.F.R. § 0.39 (2000). Jarrett is Counsel.

**7.** In addressing this question, the District Court was required to weigh "[t]he public interest in nondisclosure ... against the [appellants'] need ... for access to the privileged informa-

der disclosure.

In his declaration Jarrett contends that disclosure of document G, the closing form would "reveal findings and determinations reached by OPR regarding the allegations made against Mr. Quinlan." Jarrett Declaration at 9. He also protests that disclosure of the document would "identify the OPR investigative file number assigned to the Quinlan investigation." Disclosure of that file number would, according to Jarrett, "risk a breach of OPR's file system and disclosure of the confidential law enforcement information contained in OPR's files." *Id.* He also protests that "disclosure of the form itself would reveal internal procedures used by OPR in its investigations thus impairing its future ability to investigate similar allegations." *Id.*

As to the other document H, which is undated memo from Rogers to someone named Gerri Washington requesting that a newspaper article be placed in the OPR/Quinlan file, Jarrett asserts that portions of the note would reveal OPR's investigative techniques and procedures and thereby risk the impairment of future inquiries conducted by OPR into similar allegations. He once again expresses his concern that disclosure of the OPR investigative file number assigned to the Quinlan investigation risks "a breach of OPR's file system and disclosure of the confidential law enforcement information contained in OPR's files." Id. at 10.

Finally, speaking more generally, Jarrett insists that:

> [T]he release of the documents sought by Mr. McPeek will have an extremely detrimental and chilling effect on the cooperation OPR receives in future investigations

> tion." *In re Sealed Case*, 856 F.2d at 272. To achieve this end, a number of factors must be considered, including:
> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential de-

and the quality and candor of discussions and evaluations within this Office.

*Id.*

It is first clear that Jarrett's concerns about the disclosure of the file number or what Jarrett calls "tracking data" or "computer path names" (*id.* at 10.) in these documents can be alleviated by excising them from any document produced. Additionally, and somewhat surprisingly in light of Jarrett's declaration, defendants state as to Documents G and H that they do not dispute:

> [T]here would be no impact on the persons who have given information, that plaintiff is not an actual or potential defendant, that the investigation has closed, that no interdepartmental disciplinary proceedings arose, or that plaintiff's suit is non-frivolous.

*Defendants' Opposition to Plaintiff's Motion to Compel* at 41.

Defendant's concessions, particularly their concession that disclosure would have no impact on the persons who gave information, and the potential excising of all the "tracking data" mean that the only remaining *Tuite v. Henry* factors to be considered are whether disclosure will discourage others from providing OPR with important information in the future, whether the information is available from other sources in discovery or otherwise, and the importance of the information sought to plaintiff's case.

As to these factors, defendants protest that the information in the closing memo is available from other sources, i.e. Quinlan himself. But, Quinlan cannot tell plaintiff what other persons told Rogers when he investigated plaintiff's allegations.

> fendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case.
> *Tuite v. Henry*, 98 F.3d at 1417, citing *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973)

Whether disclosure of the closing memorandum and the note concerning the newspaper article would deter others from cooperating with future OPR investigations is a function of what the documents say and I will have to examine the document before I make that determination. I therefore will order *in camera* production of Documents G and H.

### Attorney Client and Work Product Privileges

As to all the remaining documents,[8] defendant claims the work product privilege. As to 13 of these documents, they simultaneously claim the attorney-client privilege.[9] The attorney-client privilege is absolute, but the work product privilege, found in Fed.R.Civ.P. 26(b)(3), is defeated by a showing of substantial need and an inability to secure the substantial equivalent of the protected materials by other means. Moreover, even if the work product privilege yields to a showing of need, the court must still protect absolutely the "mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R.Civ.P. 26(b)(3). *See Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 619 n. 11 (D.C.Cir.1997).

Since the defendants claim the work product for all remaining documents but the attorney-client privilege for only some of them, the greater includes the lesser. If I determine that the work product privilege applies to all of them and plaintiff cannot overcome the privilege, there is no need to rule on the attorney-client privilege as to those documents. I will initially follow that practice, borrowing it from the Court of Appeals. *See Equal Employment Opportunity Commission v. Lutheran Social Services,* 186 F.3d 959, 968 (D.C.Cir.1999).

■ To qualify for work product protection, the documents must be prepared for trial or in anticipation of litigation. The latter requirement is met in this Circuit whenever the materials are prepared in light of a lawyer's subjective and objectively reasonably belief that litigation was a real possibility. *Lutheran Social Services,* 186 F.3d at 967. Thus, a genuine fear of litigation will suffice when, for example, anonymous documents accuse an organization's president of creating a hostile work environment for female employees, *id.,* or when the chairman of the Federal Election Commission announces that the agency is investigating allegations of illegal contributions in United States elections and the press has accused the Republican National Committee of evading federal campaign finance laws by accepting and structuring the receipt of a particular contribution. *In re Sealed Case,* 146 F.3d 881 (D.C.Cir.1998). A specific claim is unnecessary if the anticipation of litigation is reasonable. Id.; *Schiller v. National Labor Relations Board,* 964 F.2d 1205, 1208 (D.C.Cir. 1992); *See also SafeCard Services, Inc. v. Securities and Exchange Commission,* 926 F.2d 1197, 1202 (D.C.Cir.1991).

■ On July 2, 1998, the law firm of Bernabei & Katz wrote a letter to Ted McBurrows, Director of the EEO Staff of DOJ, advising him that the firm had been retained by plaintiff "to represent him with respect to all claims he holds against the U.S. Department of Justice for retaliation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3(a)." *Defendant's Opposition to Plaintiff's Motion to Compel,* Exhibit B. The firm advised McBurrows it was writing "to attempt to resolve this dispute prior to initiating legal action." *Id.* The letter advised McBurrows of the firm's willingness to discuss resolution of the matter but warned him that, if he did not contact Bernabei or Katz, "we will proceed with the filing of an administrative charge of retaliation." *Id.* at 9.

Plaintiff filed that complaint with the EEO office of DOJ on October 30, 1998. A series of documents were created thereafter by attorneys who worked in the Justice Management Division, and it can be said that the investigation of the complaint and its possible

---

8. These would be documents I.1 through HH.3 as described on the chart in the Appendix.

9. Defendants also claim the attorney client privilege as to the memo OPR gave to the Attorney General (Document E). As noted above, in light of my conclusion that this document is otherwise privileged from disclosure, there is no need to determine whether it is also protected by the attorney-client privilege.

settlement at the administrative level was the reason for their creation. Many are drafts of the affidavits ultimately submitted in the EEO investigation.

Under this Circuit's forgiving standard, these documents were prepared in anticipation of litigation. The filing of an administrative complaint with an agency EEO office is a jurisdictional prerequisite to suit against an agency of the United States under Title VII of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000e–16 (1994). *See Bowden v. United States*, 106 F.3d 433, 436 (D.C.Cir.1997). A letter from a law firm, known to be sophisticated and experienced Title VII plaintiffs' counsel, made a specific claim of a violation of the Civil Rights Act and warned that, if the claim was not promptly resolved, the firm would file an administrative complaint with the EEO office on its client's behalf. Any reasonable lawyer would believe that litigation in this Court was likely if the EEO process did not result in a determination favorable to plaintiff. Indeed, to be blunt, any lawyer who did not so anticipate is too naive to be working at DOJ. Surely, if anonymous complaints of discrimination raise the sufficient potential of litigation to make a lawyer's work investigating those complaints "in anticipation of litigation," *see Lutheran Social Services*, 186 F.3d at 959, a lawyer's work responding to a specific claim of retaliation filed with an agency EEO office has to be "in anticipation of litigation."

It is no answer for plaintiff, relying on a District Court opinion from another Circuit, to dismiss what Justice Management Division officials and lawyers do as merely preparing materials used in the ordinary course of business. Magistrate Judge Vescovo was personally familiar with how one substantial employer in her district, Federal Express, subjected all its internal EEO complaints to a particular process, whether or not litigation was truly anticipated. *Miller v. Federal Express Corp.*, 186 F.R.D. 376, 387 (W.D.Tenn. 1999). She pointed out, however, that the moment the employee filed a charge with the EEOC, the work done thereafter was done in anticipation of litigation. Thus, when a complaint is filed with an agency EEO office, it has to follow that the work done thereafter is done in anticipation of any litigation that would follow if the claim is not administra-

tively resolved. The business of the Justice Management Division is the management of DOJ; it is not the preparing of affidavits to respond to EEO complaints.

Since all of the documents were prepared in anticipation of litigation and appear to have been prepared by either an attorney or a representative of a party, they appear to be protected by the attorney work product privilege. The burden now shifts to plaintiff to show a substantial need for them and an inability to secure the substantial equivalent by some other means. Plaintiff wants to see these documents to probe for inconsistencies in the witnesses' testimony between what they said in the draft and what they said in the final version of their affidavits. *See Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion to Compel* at 18–19. But, if the desire to impeach a witness with prior inconsistent statements is a sufficient showing of substantial need, the work product privilege would cease to exist; there is not a lawyer born who would not like to see opposing counsel's files in order to search for inconsistencies in opposing witnesses' potential testimony.

While I might be within my rights to deny the motion to compel now, I have decided to permit plaintiff one final opportunity to show that he can meet the demanding requirement of Fed.R.Civ.P. 26(b)(3). Additionally, while the privilege log submitted by the Department of Justice is detailed, I have decided to examine the actual documents before I make my final definitive ruling to insure that all the documents are in fact privileged in whole or in part.

We shall proceed in the following fashion. Except for the documents I have finally determined to be protected by the deliberative process and law enforcement privileges, i.e. Documents A–F, the defendants shall deliver the remaining documents identified in *Defendant's Revised Privilege Log Pursuant to Court Order of May 7, 2001* to my chambers for my *in camera* review by September 5, 2001. On the same day, plaintiff will file a memorandum of law establishing under controlling case law in this jurisdiction, or if there is no such case law, by persuasive authority elsewhere, that he has made a legally sufficient showing of a substantial need

for the documents and that he cannot secure the substantial equivalent thereof by any other means. The defendants may file an opposition thereto by September 19, 2001. Plaintiff may reply thereto by September 26, 2001. I will then issue a final ruling on the work product privilege. If I find that the work product privilege does not apply to any document and that the defendant has also claimed the attorney-client privilege to that document, I will then resolve that claim of privilege.

Finally, I appreciate that there are other issues dividing the parties and I will resolve them in a subsequent opinion.

## APPENDIX

The following alphabetical list identifies each of the named individuals in defendant's privilege log:

| Name | Position |
| --- | --- |
| Barr, William | Attorney General |
| Bush, Barbara | Attorney, Justice Management Division (JMD) |
| Colgate, Steven | Assistant Attorney General, Administration |
| Diegelman, Robert | Director, Management and Planning Staff (MPS) |
| Dixon, Lynn | Deputy Director, Management and Planning Staff (MPS) |
| Frisch, Stuart | Attorney, Justice Management Division (JMD) |
| Hedge, Brook (Judge) | Former Director, Federal Programs Branch of the Civil Division |
| Hurst, Brenda | Employee, Management and Planning Staff (MPS) |
| Jones, Phyllis | Ms. Sposato's Secretary |
| Lapara, Joan | Mr. Colgate's Secretary |
| Leigh, Gilbert | JMD Staff |
| McPeek, Steven | Plaintiff |
| Orr, David | Assistant Director, Management and Planning Staff (MPS) |
| Quinlan, J. Michael | Former Director, Bureau of Prisons |
| Rogers, Richard | Attorney, Office of Professional Responsibility (OPR) |
| Rosario, Anna | DOJ EEO Staff |
| Shaheen, Michael | Counsel, Office of Professional Responsibility (OPR) |
| Sposato, Janis | Deputy Assistant Attorney General, Law and Policy |
| Walden, Deidre | Secretary |
| Washington, Gerrie | OPR Support Staff |

The following chart denotes the date, author, recipient and topic of the documents and identifies the privilege(s) claimed by defendants. (DP = Deliberative Process, LE = Law Enforcement, AC = Attorney Client, WP = Work Product):

| Doc. | Date | Author | Recipient | Topic | Privilege |
| --- | --- | --- | --- | --- | --- |
| A. | 10/19/92 | R. Rogers | — | Handwritten notes re: conversation with B. Hedge re: S. McPeek's allegations re: M. Quinlan | DP, LE |
| B. | 10/20/92 | R. Rogers | — | Handwritten notes re: interview with M. Quinlan re: S. McPeek's allegations | DP, LE |
| C. | 10/22/92 | R. Rogers | — | Handwritten notes re: interview with individual [10] re: S. McPeek's allegations re: M. Quinlan | DP, LE |
| D. | — | R. Rogers | — | Notes re: information obtained in interviews re: S. McPeek's allegations | DP, LE |
| E. | 11/17/92 | M. Shaheen | W. Barr | Memo re: M. Quinlan and OPR's investigation of S. McPeek's allegations | AC, DP, LE |
| F. | 11/17/92 | M. Shaheen | W. Barr | Draft of Memo in "E" | DP, LE |

**10.** According to *Defendant's Revised Privilege Log Pursuant to Court Order of May 7, 2001,* the name of this individual was separately provided to plaintiff under the terms of a previously issued protective order.

## APPENDIX—CONTINUED

| | | | | | |
|---|---|---|---|---|---|
| G. | 3/14/94 | — | — | OPR 1 Form closing OPR case file re: investigation | LE |
| H. | — | R. Rogers | G. Washington | Memo requesting that newspaper article go in OPR file re: M. Quinlan | LE |
| I.1 | 10/99 | — | — | Draft affidavits of J. Sposato re: EEO investigation | AC, WP |
| I.2 | — | J. Sposato, B. Bush | — | Notes re: draft affidavits and proposed changes | AC, WP |
| I.3 | 10/6/99 | B. Bush | P. Jones | E-mail with draft affidavit for J. Sposato's review | AC, WP |
| J. | 10/6/99 | B. Bush | S. Colgate (cc: S. Frisch) | E-mail re: S. Colgate's affidavit in EEO investigation | AC, WP |
| K. | 5/10/99 | G. Leigh | B. Bush | E-mail re: G. Leigh's affidavit in EEO investigation and draft of affidavit | AC, WP |
| L.1 | 5/10/99 | B. Hurst | B. Bush | E-mail re: B. Hurst's responses to interrogatories in re: EEO investigation | AC, WP |
| L.2 | 5/10/99 | B. Hurst | B. Bush | E-mail re: B. Hurst's personnel history | AC, WP |
| L.3 | — | — | — | Two copies of draft affidavit-one with B. Bush notes | AC, WP |
| L.4 | — | — | — | EEO questions for B. Hurst with B. Hurst's notes | AC, WP |
| L.5 | 8/2/99 | B. Bush | B. Hurst | Fax re: B. Hurst's affidavit | AC, WP |
| L.6 | 5/10/99 | B. Bush | D. Walden | E-mail transmitting draft of B. Hurst affidavit | WP |
| L.7 | 5/11/99 | D. Walden | B. Bush | E-mail transmitting draft of B. Hurst affidavit | WP |
| M.1 | 9/99–10/99 | — | — | Draft affidavits of M. Archer with B. Bush's edits | AC, WP |
| M.2 | 9/7/99 | M. Archer | — | E-mail and transmission of answers to questions in re: EEO investigation | AC, WP |
| M.3 | — | — | — | Draft of B. Hurst affidavit (sent by e-mail from B. Bush to D. Walden) | AC, WP |
| N.1 | 9/28/99 | S. Frisch | B. Bush | E-mail forwarding e-mail from J. Lapara transmitting S. Colgate's responses to interrogatories in re: EEO investigation | AC, WP |
| N.2 | 10/99 | — | — | Draft affidavits of S. Colgate in re: EEO investigation along with handwritten notes by B. Bush, J. Sposato, and S. Frisch | AC, WP |
| N.3 | — | — | — | Proposed questions for S. Colgate in re: EEO investigation with handwritten notes by B. Bush | AC, WP |
| N.4 | 10/6/99 | B. Bush | J. Lapara (cc: S. Frisch) | E-mail transmitting revised affidavit of S. Colgate and noting changes | AC, WP |
| N.5 | 10/8/99 | B. Bush | S. Colgate (cc: J. Lapara) | E-mail transmitting revised affidavit of S. Colgate | WP |
| O.1 | 9/28/99 | S. Frisch | B. Bush | E-mail forwarding e-mail from P. Jones transmitting J. Sposato's responses to interrogatories in re: EEO investigation | AC, WP |
| O.2 | 10/5/99 | B. Bush | J. Sposato | E-mail transmitting J. Sposato's affidavit for review | AC, WP |

## APPENDIX—CONTINUED

| | | | | | |
|---|---|---|---|---|---|
| O.3 | 10/7/99 | B. Bush | P. Jones | E-mail transmitting revised affidavit of J. Sposato | AC, WP |
| O.4 | 10/8/99 | B. Bush | J. Sposato | E-mail transmitting affidavit of J. Sposato and B. Bush's notes | AC, WP |
| P.1 | 4/99, 5/99 | — | — | Draft affidavits of R. Diegelman in re: EEO investigation with notes by B. Bush, S. Frisch, and R. Diegelman and reflecting info. provided to B. Bush by Diegelman | AC, WP |
| P.2 | — | — | — | Questions for R. Diegelman re: EEO investigation with B. Bush notes | AC, WP |
| P.3 | — | — | — | Draft affidavit of R. Diegelman sent as attachment to 5/13/99 e-mail from B. Bush to D. Walden | WP |
| P.4 | 5/14/99 | D. Walden | B. Bush | E-mail and draft affidavit of R. Diegelman | WP |
| Q.1 | — | — | — | Questions for D. Orr re: EEO investigation with B. Bush's notes | AC, WP |
| Q.2 | 5/4/99 | — | — | Draft affidavit of D. Orr prepared with B. Bush | AC, WP |
| Q.3 | 5/10/99 | D. Walden | B. Bush | E-mail transmitting two affidavits of D. Orr and affidavit of G. Leigh | WP |
| Q.4 | 5/10/99 | B. Bush | D. Walden | E-mail transmitting affidavit of D. Orr | WP |
| R. | — | — | — | 5/5/99 affidavit of L. Dixon with B. Bush's notes (based on conversation with L. Dixon) | AC, WP |
| S. | — | — | — | B. Bush's notes (based on conversation with R. Diegelman) re: S. McPeek's allegations in EEO complaint | AC, WP |
| T. | — | — | — | B. Bush's notes (based on meeting with R. Diegelman) re: S. McPeek's allegations in EEO complaint | AC, WP |
| U. | 8/21/98 | — | — | S. Frisch's notes re: S. McPeek's allegations (based on meeting with R. Diegelman) | AC, WP |
| V. | 8/24/98 | — | — | S. Frisch's notes re: counseling session with R. Diegelman and A. Rosario | WP |
| W.1 | — | — | — | Draft letter from B. Bush to 12/20/99 letter from L. Bernabei re: settlement | WP |
| W.2 | — | — | — | Draft letter from B. Bush to 12/20/99 letter from L. Bernabei re: settlement with 12/22/99 e-mail from B. Bush to D. Walden | WP |
| X.1 | 3/23/99 | B. Bush | J. Sposato | E-mail captioned "Confidential Personnel Matter" requesting comments on draft letter from B. Bush to D. Marshall (Draft letter is response to 3/11/99 letter from D. Marshall to A. Rosario declining ADR in re: S. McPeek's EEO complaint) | WP |
| X.2 | — | — | — | Two drafts of letter from B. Bush to D. Marshall with notes by R. Diegelman and B. Bush | WP |
| X.3 | 3/24/99 | B. Bush | D. Walden | E-mail transmitting letter from B. Bush to D. Marshall | WP |
| Y.1 | 10/5/99 | J. Sposato | B. Bush, S. Colgate (cc: S. Frisch) | E-mail re: interpretation of confidentiality provision of settlement agreement | WP |
| Y.2 | 10/5/99 | B. Bush | J. Sposato, S. Colgate, S. Frisch | E-mail response to e-mail re: interpretation of confidentiality provision of settlement agreement | WP |

**APPENDIX—CONTINUED**

| | | | | | |
|---|---|---|---|---|---|
| Z.1 | 11/30/99 | B. Bush | R. Diegelman, S. Colgate, J. Sposato | E-mail captioned "Update: EEO Matter" re: S. McPeek's request for final agency decision without hearing | WP |
| Z.2 | 11/30/99 | J. Sposato | B. Bush | Response to e-mail captioned "Update: EEO Matter" re: S. McPeek's request for final agency decision without hearing | WP |
| Z.3 | 12/1/99 | B. Bush | J. Sposato | Response to reply to e-mail captioned "Update: EEO Matter" re: S. McPeek's request for final agency decision without hearing and re: supplement report of investigation | WP |
| AA.1 | 12/16/99 | B. Bush | J. Sposato, P. Jones (cc: S. Frisch) | E-mail and attachment of draft responses to 12/10/99 letter from L. Bernabei to D. Marcus (for review and comment) | WP |
| AA.2 | 12/17/99 | B. Bush | J. Sposato, P. Jones (cc: S. Frisch) | Retransmission of e-mail and attachment of draft responses to 12/10/99 letter from L. Bernabei to D. Marcus (for review and comment) | WP |
| AA.3 | 12/17/99 | B. Bush | D. Walden (cc: S. Frisch) | E-mail transmitting draft letter (responsive to 12/10/99 letter from L. Bernabei to D. Marcus) | WP |
| BB.1 | 1/11/00 | B. Bush | J. Sposato, S. Frisch | E-mail captioned "EEO matter" and attachment of draft response to 1/7/00 letter from L. Bernabei (for review and comment) | WP |
| BB.2 | 1/11/00 | J. Sposato | B. Bush, S. Frisch | Reply letter commenting on draft response to 1/7/00 letter from L. Bernabei | WP |
| CC.1 | 11/29/99 | — | — | Excerpt from 11/29/99 letter from L. Bernabei to N. White with B. Bush's notes re: S. McPeek's allegations and the Report of Investigation | WP |
| DD. | — | — | — | B. Bush's notes re: S. McPeek's allegations | WP |
| EE. | — | — | — | Two copies of excerpts of S. McPeek's EEO affidavit with B. Bush's notes re: information obtained from R. Diegelman | WP |
| FF. | — | — | — | B. Bush's notes on S. McPeek's EEO affidavit | WP |
| GG.1 | 2/9/00 | B. Bush | N. White | Fax cover sheet and transmission of S. McPeek's complain with B. Bush's notes | WP |
| GG.2 | 2/9/00 | B. Bush | Giles | Fax cover sheet and transmission of S. McPeek's complain with B. Bush's notes | WP |
| HH.1 | 5/7/99 | B. Bush | J. Sposato | Fax forwarding 5/4/99 fax from D. Katz to B. Bush along with 5/4/99 letter from D. Katz to B. Bush re: EEO complaint | WP |
| HH.2 | — | — | — | B. Bush's notes re: 5/13/99 phone call with D. Katz | WP |
| HH.3 | — | — | — | B. Bush note to J. Sposato re: 5/13/99 phone call with D. Katz | WP |